UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

WORLD GTL INC. and
WORLD GTL ST. LUCIA LTD.,

                Plaintiffs,                10 Civ. 1542 (LMM)

         -against-

                                       ECF CASE

PETROLEUM COMPANY OF TRINIDAD AND
TOBAGO LTD.,

                Defendants.

-------------------------------------------------------------- x

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION

**BRODEGAARD & SIMONE LLC**
110 East 59th Street, 23rd Floor
New York, New York 10022
Telephone: (212) 813-0620
Facsimile: (646) 355-1920

*Attorneys for Plaintiffs*
World GTL Inc. and
World GTL St. Lucia Ltd.

July 6, 2010

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES ................................................................................ | i |
| PRELIMINARY STATEMENT ......................................................................... | 1 |
| BACKGROUND ................................................................................................. | 3 |
| ARGUMENT ....................................................................................................... | 8 |
| I.   PLAINTIFFS SHOULD NOT BE COMPELLED TO ARBITRATE AS THERE IS NO APPLICABLE ARBITRATION CLAUSE .............................. | 8 |
|     A. Defendant's Legal Argument to Compel Arbitration Cannot Apply to Plaintiffs' Complaint Because the Arbitration Clauses Presented by Defendant Are Inapplicable to the Claims Asserted in Plaintiffs' Complaint ........................................................ | 9 |
|     B. The Arbitration Clauses Presented by Defendant Do Not Cover Plaintiffs' Claims as Presented in Plaintiffs' Complaint ............................................................................... | 12 |
| II.   PLAINTIFFS SHOULD NOT BE COMPELLED TO ARBITRATE NOR SHOULD THE COURT STAY THIS ACTION AS PLAINTIFFS ARE BARRED FROM MAKING ANY COUNTER-CLAIMS IN ARBITRATION AND THEREFORE CAN SEEK NO AFFIRMATIVE RELIEF IN ANY OTHER COURT ........................................................ | 12 |
| III.   THE COURT SHOULD NOT STAY THIS ACTION PENDING ARBITRATION OF DEFENDANT'S CLAIMS ............................................. | 14 |
| CONCLUSION .................................................................................................... | 15 |

# TABLE OF AUTHORITIES

**Page**

## STATE CASES

*The Redemptorists v. Coulthard Services, Inc.*,
    145 Md. App. 116, 801 A.2d 1104 (2002) .................................................................. 12

## FEDERAL CASES

*Green Tree Financial Corp.-Ala. v. Randolph*,
    531 U.S. 79, 121 S. Ct. 513, 148 L.Ed.2d 373 (2000) ................................................. 13, 14

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
    252 F.3d 218 (2d Cir. 2001), cert. denied, 122 S. Ct. 546,
    151 L. Ed. 2d 423 (U.S. 2001) .................................................................................... 11

*Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72 (2d Cir. 1998) .......................................... 14

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
    241 F.3d 135 (2d Cir. 2001) ........................................................................................ 9

## STATUTES

9 U.S.C. § 2 ................................................................................................................................ 9

9 U.S.C. § 3 ................................................................................................................................ 14

Plaintiffs World GTL Inc. ("World GTL") and World GTL of St. Lucia Ltd. ("World GTL-SL" and collectively, "WGTL" or "Plaintiffs"), by their attorneys Brodegaard & Simone LLC, submit this memorandum of law in opposition to the motion to compel arbitration and to stay this action of Defendant Petroleum Company of Trinidad and Tobago Ltd. ("Petrotrin" or "Defendant").

## PRELIMINARY STATEMENT

To maximize the value of its limited supply of natural gas, the Republic of Trinidad and Tobago ("Trinidad") and Defendant were eager to have a small to midsized gas-to-liquid plant built in Trinidad. Accordingly, it induced WGTL to use and disclose its technology and to invest both time and money to build such a plant. But after having WGTL disclose and implement its technology and having spent over three years developing and constructing the plant, on the eve of its completion, Petrotrin, with full knowledge and consent of Trinidad, executed its secret plan to expropriate the plant.

This action arises out of the fraud by Petrotrin and the ensuing wrongful taking and expropriation of a nearly completed gas-to-liquid plant which was on the eve of operation in Trinidad and physically located within the Petrotrin refinery there. Knowing full well that the construction loan to finance the building of the plant would be in incurable default by July 12, 2009 and that WGTL had another institution ready, willing and able to take out the construction lender, Defendant did all they could to successfully block this new take-out loan and mislead and deceived WGTL so as not to timely engage this take-out lender, all while assuring WGTL that Defendant would pay off the loan, to avoid default.

1

In Defendant's motion papers, it refers to several agreements, including the project agreement, the shareholders agreement, and the guarantee contribution agreement. However, in WGTL's complaint the agreement primarily referred to is the credit agreement between, among others, the two parties. Defendant is attempting to compel arbitration and stay this action based upon contractual agreements between the parties that are not related to the immediate cause of action.[1]

Furthermore, the claims set forth in the Complaint assert, *inter alia*, fraud, negligence, and negligent misrepresentation – none of which are covered by the arbitration clauses advanced by Defendant. As these claims were not included in, nor foreseeable for, the arbitration clauses provided by Defendant, they cannot be included in arbitration.

Finally, Defendant is aware that Plaintiffs provided their Answer to the pending arbitration before the International Chamber of Commerce (the "ICC"). (Attached as Exhibit H to the Declaration of Louis B. Kimmelman in support of Defendant's Motion to Compel Arbitration and Stay the Action ("Kimmelman Dec.").) That answer did not include any counter-claims by Plaintiffs. Moreover, the ICC has demanded that WGTL put up in excess of $300,000 as its part of the arbitration fee required by the ICC to allow WGTL the privilege of being a respondent in that proceeding. Such a fee imposed upon a respondent is shocking to the conscience. Therefore, to force Plaintiffs into arbitration where to assert its claims it would have to deposit hundreds of thousands of dollars would effectively preclude Plaintiffs from making any claims against Defendant. As such, without this action, Plaintiffs are barred from any affirmative relief for their claims for fraud, negligence, misrepresentations, wrongful taking and

---

[1] There is one minor claim which relates to the Shareholders Agreement - as and for a third claim: Breach of contract and breach of the covenant of good faith and fair dealing. However, it should be noted that this breach of contract and breach of the covenant of good faith and fair dealing as alleged in the third claim of Plaintiffs' Complaint occur due to Defendant's malfeasance and misdoings with the terms under the Credit Agreement.

2

expropriation. It would be a travesty to justice to allow Defendant to acquit itself of all claims brought by Plaintiffs without any trial in any venue.

## BACKGROUND

In 2004 the Permanent Secretary of Energy for Trinidad requested World GTL to make a presentation to Trinidad on its capabilities of building a 2,000 barrel a day gas-to-liquid plant. World GTL was ideally suited to do this as it had the technology to build such a plant whereas the major refining companies predominantly were interested in building considerably larger plants which were unsuitable for Trinidad as Trinidad did not have sufficient gas reserves to support such a plant.

In May 2004, World GTL and Petrotrin entered into a Memorandum of Understanding to build a gas-to-liquid plant and subsequently on September 22, 2005, Petrotrin and World GTL entered into a Project Agreement for a gas-to-liquid project at Pointe-a-Pierre, Trinidad. The World GTL Trinidad Ltd. ("WGTL-Trinidad") facility was to be and was built within Petrotrin's refinery at Pointe-a-Pierre, Trinidad. WGTL-SL and World GTL were assured that this would be an environmentally safe location.

WGTL-Trinidad is a company that was jointly established by World GTL (through WGTL-SL) and Petrotrin with its principal place of business at Pointe-a-Pierre, Trinidad. At all relevant times, WGTL-SL had a 51% ownership interest and Petrotrin had a 49% ownership interest in WGTL-Trinidad.

At the behest of Petrotrin, Credit Suisse was among the financial institutions approached to provide funding, largely because a former Trinidad finance minister was now at Credit Suisse. Credit Suisse agreed to provide a $125 million Credit Facility and on or about January 12, 2007,

3

WGTL and Petrotrin entered into certain agreements constituting the Credit Agreement and related security and financing agreements (collectively, the "Credit Agreement"). The Credit Agreement provided for a construction loan which, after plant completion (as defined in the Credit Agreement) the credit facility would become a non-recourse term loan. The Credit Suisse loan was jointly and severally guaranteed by Petrotrin and World GTL. Among other things, the Credit Agreement provided that the facility had to meet the Lender Reliability Tests prior to July 12, 2009 (the "Date Certain"). Failure to meet these requirements by the Date Certain was a Fundamental Event of Default for which there was no cure. Therefore, as of the Date Certain, if the Lender Reliability Tests had not been met the debt was fully matured and payable.

The Lender Reliability Tests, *inter alia*, required that at a point in time prior to July 12, 2009, the facility produce almost 200,000 barrels of gas-to-liquid, of which approximately 150,000 barrels would be gas-to-liquid diesel over a 90 day period. The agreement also required the facility to produce approximately 2,250 barrels per day of gas-to-liquid product during this 90-day period.

In March 2007, shortly after entering into the financing agreement with Credit Suisse, all construction at the WGTL-Trinidad facility had to be suspended for a prolonged period as the result of sulfur emissions from the Petrotrin refinery. These sulfur emissions caused plant evacuations and massive productivity loss and construction delays. The plant was emitting sulfur dioxide and contaminating the entire facility. Sulfur dioxide is not only a noxious gas, but at moderate levels can be highly irritating to the lungs and air passages and at large levels can be life-threatening. It was not until August 2007 that Petrotrin presented to the WGTL-Trinidad Board of Directors a plan to correct the sulfur problem and promised to meet emission levels as called for under a draft environmental act of 2005.

4

Despite Petrotrin's "plan" to correct the sulfur emissions problem, there continued to be episodes of sulfur emission which forced plant evacuations and shut-downs. Indeed, these emissions dramatically increased as the Lender Reliability Tests approached. These shut-downs and protracted delays were a major cause of massive cost overruns and delays. As a result of Petrotrin's misfeasance or malfeasance in being incapable of preventing or unwilling to prevent these numerous and prolonged sulfur emissions, plant evacuations and construction shut-downs resulted and by mid-2008 it was clear that the Lender Reliability Tests were unlikely to be achieved by the Date Certain of July 12, 2009.

Realizing that in large part due to the numerous and prolonged sulfur emissions at Petrotrin's refinery, the Lender Reliability Tests could not be met by the Date Certain of July 12, 2009, World GTL in late 2008 began to explore with Credit Suisse an extension of the Date Certain or finding a new lender to take out the loan from Credit Suisse. Credit Suisse opposed an amendment unless WGTL-Trinidad took out a new loan for $300 million at fourteen plus percent interest rate. As the interest rate was excessively high and WGTL-Trinidad did not need $300 million, the WGTL-Trinidad Board of Directors rejected the proposal and approved World GTL seeking other financing.

World GTL met with several financial institutions who were very interested in providing additional financing and taking out Credit Suisse. Barclays Capital (a division of Barclays Bank PLC) was one such party who was interested in taking out the Credit Suisse loan and providing the additional $100 million that was required to complete the gas-to-liquid facility in Trinidad.

At a meeting held at Petrotrin's facility in Trinidad, Barclays Capital made a presentation of various options that were available to WGTL-Trinidad for additional financing and replacing

5

the Credit Suisse loan. This meeting was attended by the Petrotrin appointed WGTL-Trinidad board members, Ken Allum, Charmaine Baptiste and Kevin Singh. Ms. Baptiste, who is also Chairman of Petrotrin's finance committee, chose an option that would likely be balance sheet neutral to Petrotrin.

After having made the choice as to how to proceed with the financing, WGTL-Trinidad and Barclays Capital entered into an exclusive agreement by which Barclays Capital was to go forward in terms of preparing the necessary documentation. In the coming months, WGTL-Trinidad incurred in excess of $900,000 in legal, accounting and other professional fees in furtherance of this transaction. This expenditure was subsequently approved by the WGTL-Trinidad board at the board meeting held on August 17, 2009.

At a meeting of the WGTL-Trinidad board on May 27, 2009, the latest Barclays Capital term sheet was presented and found acceptable and a closing date for refinancing with Barclays Capital was scheduled for July 6, 2009. Also at this meeting, Credit Suisse's demand for a "make-whole" premium as part of being taken out was unanimously rejected by the board.

By at least May 27, 2009, Barclays Capital was willing to underwrite a $225 million, 9.12% long-term bond issue. During the period of time that Barclays was preparing to offer this bond issue, Petrotrin was also seeking to do its own bond offering for $850 million to upgrade its refinery. As the Barclays Capital transaction got closer to fruition, the Petrotrin board members started to raise obstacles to the Barclays Capital bond offering arguing that they were told by their investment bankers that the WGTL-Trinidad bond offering would adversely impact their ability to raise $850 million through their own bond offering. The Petrotrin-appointed board members of WGTL-Trinidad therefore requested that WGTL-Trinidad delay its bond offering

until Petrotrin had closed on its $850 million bond offering. The World GTL-appointed board members expressed concern over the fact that the Lender's Reliability Test could not be met and that a delay would mean that on the Date Certain there would be a Fundamental Event of Default under the Credit Suisse Credit Agreement. This issue was squarely addressed at the June 29, 2009 WGTL-Trinidad board meeting. Kevin Singh, a Petrotrin-appointed board member, told the World GTL-appointed board members not to worry about the Date Certain and not being able to meet the Lender Reliability Tests by that date as Petrotrin would pay off the loan, not let it go into default and the Barclays Capital bond offering would go forward after the Petrotrin Bond Offering closed.

Never did any Petrotrin-appointed WGTL-Trinidad board member indicate that Petrotrin intended to buy the loan nor did they invite WGTL to participate in acquiring the loan, on information and belief, Petrotrin clearly wanted to use its acquisition of the loan to expropriate the gas-to-liquid facility. WGTL relied on Defendant's representations and the assumed good faith of its co-venturer; however, rather than helping WGTL secure alternate financing or paying off the loan to avoid default, without any notice to WGTL, Defendant bought the entire loan. Although Defendant could have paid off the loan for the face amount of the loan, thus saving the venture from its main creditor, it instead paid a premium to quickly acquire the loan by assignment and become the venture's main creditor.

Having the loan and its related security agreements assigned to it, Defendant then tried to renegotiate its agreements with WGTL so as to take control of the gas-to-liquid facility. When WGTL refused to succumb to Defendant's heavy-handed tactics, Defendant, using the formidable array of security provisions meant for the protection of the lender – and not for a co-venturer – had a handpicked Trinidadian receiver installed who, upon information and belief, at

7

the direction of Defendant took over the operations of the facility. Thus, by buying a $125 million loan – and paying an over $16 million premium to get an assignment of the loan with its stringent security provisions, Defendant acquired 100% of a $500 million plus gas-to-liquid plant, and left WGTL with nothing.[2]

## ARGUMENT

### I. PLAINTIFFS SHOULD NOT BE COMPELLED TO ARBITRATE AS THERE IS NO APPLICABLE ARBITRATION CLAUSE

In filing this action, Plaintiffs have not breached any of the obligations to arbitrate "[a]ny dispute, controversy or claims arising out of or related to" the Project Agreement and the Shareholders Agreement and "the breach, termination or invalidity" thereof. Rather, Plaintiffs brought their claims primarily under the Credit Agreement, which contains no such obligation to arbitrate and under traditional tort law.

Defendant constantly refers the Court to the Project Agreement and the Shareholders Agreement for language of the arbitration clauses. However, in Plaintiffs' Complaint, the Court is referred to the Credit Agreement. Other than one minor claim, there is nothing in Plaintiffs' claims that refer to either the Project Agreement or the Shareholders Agreement. All of the claims in Plaintiffs' Complaint arise out of the malfeasance and misdoings of Defendant with regard to the Credit Agreement or are based on fraud or negligence. Therefore, the arbitration clauses of the Project Agreement and the Shareholders Agreement have no bearing on Plaintiffs' Complaint. As a result, the Court should not compel arbitration of Plaintiffs' claims.

---

[2] It then had the temerity to commence the ICC arbitration in which it demands that WGTL pay it $100,000 for its share of completing the plant which Petrotrin took.

8

## A. Defendant's Legal Argument to Compel Arbitration Cannot Apply to Plaintiffs' Complaint Because the Arbitration Clauses Presented by Defendant Are Inapplicable to the Claims Asserted in Plaintiffs' Complaint

Defendant bases its argument to compel arbitration on the arbitration clauses found in the Project Agreement and the Shareholders Agreement. However, the Complaint alleges fraud, negligent misrepresentation, unjust enrichment, negligence and expropriation[3] – all of which are directly related to events and occurrences surrounding the Credit Agreement. (Attached as Exhibit D to the Kimmelman Dec.) The arbitration clauses referred to by Defendant would only be applicable to the contract in which the clause was found, as there are no incorporation clauses found within any of the Agreements mentioned by Defendant. Certainly Plaintiffs should not be compelled to arbitrate its fraud, negligent misrepresentation and negligence claims.

Defendant refers to the New York Convention and Section 206 of the Federal Arbitration Act ("FAA") as the crux of its argument. According to Defendant's Memorandum of Law in Support of its Motion to Compel Arbitration and Stay the Action, "Based on Section 202 of the FAA, an agreement to arbitrate is governed by the New York Convention if: '(1) there is a *written agreement*; (2) the *writing* provides for arbitration in the territory of a signatory of the [New York] Convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope.' (*Emphasis* added.) (*See* Defendant's Memorandum of Law in Support of Motion to Compel Arbitration pages citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001).) Furthermore, under 9 U.S.C. § 2 , "A *written provision* in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or *an agreement in writing to*

---

[3] The Complaint also brings a claim for breach of contract, as discussed in footnote 1.

9

*submit to arbitration* an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (*Emphasis* added.)

Under the Credit Agreement there is no written arbitration clause; rather the Credit Agreement provides in court litigation in either the state or federal courts of New York. Furthermore, various sections within the Credit Agreement prove that there was no intent for there to be an arbitration clause incorporated into the agreement. The first section which unequivocally shows an intent to adjudicate rather than arbitrate any claim arising out of, under or in connection with the Credit Agreement is Section 9.15 – Waiver of Jury Trial. According to Section 9.15 (which within the contract is in all capital letters): "Each of the parties hereto and hereby knowingly, voluntarily and intentionally waives the right any of them may have to a trial by jury in respect of ANY litigation based on, or arising out of, under or in connection with, this agreement, the notes or any other financing document…" If arbitration was intended for any and all instances arising out of the Credit Agreement, there would be no need for a waiver of a jury trial. Another section which shows intent to adjudicate rather than arbitrate is Section 9.8, which is the no immunity clause, which provides that the Borrower waive all claims of immunity, if litigation should arise from the Credit Agreement.[4] Finally, under Section 9.20, the Credit Agreement provides that "[t]he Borrower hereby submits to the nonexclusive jurisdiction of the

---

[4] According to Defendant's Memorandum of Law in Support of its Motion to Compel Arbitration and Stay this Action, footnote 2, Defendant attempts to reserve all of its defenses. However, by submitting this motion, Defendant has availed itself of this Court and therefore has waived any and all jurisdictional defenses. Furthermore, according to the Credit Agreement, under which Plaintiffs' causes of action arose, there is a no immunity clause – Section 9.8 – which provides: "[t]o the extent that the Borrower may be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Agreement or any other Financing Document, to claim for itself or its revenues, assets or Properties any immunity (including sovereign immunity) from suit, the jurisdiction of any court, …, the Borrower hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the fullest extent permitted by the Law of the applicable jurisdiction." As it was WGTL-Trinidad that entered into this agreement and both World GTL and Petrotrin are co-venturers in WGTL-Trinidad; as parent companies, they have also waived immunity by entering into this agreement.

United States District Court for the Southern District of New York and of any New York State court sitting in New York City for the purposes of all legal proceedings *arising out of or relating to this Agreement*." (*Emphasis* added.)

Furthermore, while the Second Circuit Court has held that because the FAA expresses a liberal federal policy favoring arbitration agreements, any doubts concerning the scope of "arbitrable issues" that arise during the course of the parties' relationship should be resolved in favor of arbitration. The Court emphasized, however, that arbitration "remains a creature of contract." Therefore, a party cannot be required to submit any dispute to arbitration that that party "has not agreed to so submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 223 (2d Cir. 2001), cert. denied, 122 S. Ct. 546, 151 L. Ed. 2d 423 (U.S. 2001). Defendant claims that Plaintiffs' claims arise out of or relate to the Project Agreement and the Shareholders Agreement is incorrect. Defendant attempts to argue that because both Agreements contained broad arbitration clauses, that these clauses must be incorporated into the Credit Agreement. With the evidence directly to the contrary – no arbitration clause was written into nor meant to be incorporated in the Credit Agreement – it is obvious that none of the parties involved with the Credit Agreement agreed to submit themselves to arbitration under the Credit Agreement. Rather, they agreed to subject to the jurisdiction of the federal or state courts of New York. And certainly no one has agreed to arbitrate fraud, negligence or other tort claims.

Defendant attempts to use alternate contracts – the Project Agreement and the Shareholder's Agreement - to convince the Court that arbitration should be compelled in this case; however, the Credit Agreement, which is not discussed in Defendant's argument, provides for no such arbitration clause. Therefore there is no writing as required by both the New York Convention and Section 202 of the FAA. Rather, there is *clear and unmistakable evidence* that

11

no arbitration clause was to be incorporated into the Credit Agreement. Therefore, Plaintiffs should not be forced to submit to arbitration.

### B. The Arbitration Clauses Presented by Defendant Do Not Cover Plaintiffs' Claims as Presented in Plaintiffs' Complaint

Tort claims are arbitrable when they arise in or out of a commercial contract which contains a broad arbitration clause and the nature of the dispute has a significant relationship to the overall commercial contract. Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations encompassed in the arbitration demand (or, if litigated first, in the complaint), rather than the legal causes of action asserted therein. *The Redemptorists v. Coulthard Services, Inc.*, 145 Md. App. 116, 801 A.2d 1104 (2002). Plaintiffs' Complaint included claims for fraud, negligent misrepresentation and negligence. Each of the claims relate to the Credit Agreement. The Credit Agreement does not contain a broad arbitration clause. Furthermore, if the tort claims have a significant relationship, it is to the Credit Agreement; not to the Project Agreement or the Shareholder's Agreement where the arbitration clauses asserted by Defendant are found. Therefore, these claims are not provided for by the arbitration clauses and cannot be arbitrated as such.

### II. PLAINTIFFS SHOULD NOT BE COMPELLED TO ARBITRATE NOR SHOULD THE COURT STAY THIS ACTION AS PLAINTIFFS ARE BARRED FROM MAKING ANY COUNTER-CLAIMS IN ARBITRATION AND THEREFORE CAN SEEK NO AFFIRMATIVE RELIEF IN ANY OTHER COURT

Defendant brought its own causes of action against Plaintiff in a separate suit. However, Defendants causes of action asserted in the arbitration arose from the Guarantee Contribution Agreement (the "GCA"). Therefore, Defendant was obligated to bring its action in arbitration. WGTL provided an answer to Defendant's complaint in the arbitral proceeding. However, WGTL asserted no counter-claims or affirmative defenses in that action, as this case was already

pending in Federal Court. Any claims Plaintiffs had against Defendant were already served on them through this action commenced well in advance of the demand for arbitration. The time to assert any counter-claims against Defendant in its arbitral proceeding has passed. (*See* Certification of Emilie Simone ("Simone Cert.") Exhibit D.) Therefore, Plaintiffs would be unable to state its claims in an arbitral proceeding. In *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L.Ed.2d 373 (2000), the Supreme Court recognized that it would be unfair to stop a party "from effectively vindicating her federal statutory rights in the arbitral forum." (531 U.S. at 90, 121 S. Ct. 513.) If Defendant is allowed to force these claims into arbitration, Plaintiffs would be barred from making its claims – effectively stopping Plaintiffs from vindicating their rights in the arbitral forum. Plaintiffs would be essentially stopped from seeking any affirmative relief in any court or tribunal for the claims made in their Complaint. This goes against the basic rights of a litigant to have its day in court, as well as the public policy behind compelling arbitration.

Furthermore, according to the ICC, the costs of arbitration for Plaintiffs are over $300,000. (*See* Simone Cert. Exhibit C.) This amount does not include legal fees or transportation and lodging during the arbitration. These costs are much higher than Plaintiffs would expect to pay for a trial in federal court here in New York. In *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L.Ed.2d 373 (2000), the Supreme Court recognized that "the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum" (*Id.* at 90, 121 S. Ct. 513), a result which cuts against the broad public policy in favor of arbitration. Further, the Supreme Court adopted a case-by-case approach by ruling that "where ... a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the

13

burden of showing the likelihood of incurring [the] costs" that would deter the party from arbitrating the claim (*Id.* at 92, 121 S. Ct. 513). Although the *Green Tree* Court did not set forth a standard of how detailed a showing the party seeking to invalidate an arbitration agreement must make, the Court held the "risk" of "prohibitive costs is too speculative to justify the invalidation of an arbitration agreement" (*Id.* at 91, 121 S. Ct. 513). In this case it is clear that the costs would preclude Plaintiffs from effectively vindicating its rights in the arbitral forum, as Plaintiffs cannot afford the costs to pay the arbitral tribunal.

## III. THE COURT SHOULD NOT STAY THIS ACTION PENDING ARBITRATION OF DEFENDANT'S CLAIMS

Section 3 of the FAA provides that if a party brings a suit or proceeding in an U.S. court "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action" pending arbitration. 9 U.S.C. § 3. Defendant claims that Section 3 of the FAA is applicable in this action and the action should be stayed pending arbitration. However, Plaintiffs have shown that the arbitration clauses provided by Defendant are not applicable to the claims here asserted. Therefore, this action should not be stayed as arbitration is unjustified and should not be compelled.

According to Defendant, "[a] court considers the same factors in determining whether to stay proceedings pending arbitration as it does in determining whether to compel arbitrations, namely, whether the parties made an agreement to arbitrate and the scope of the arbitration clause." (*See* Defendant's Memorandum of Law in Support of Motion to Compel Arbitration pages citing *Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998).) In this

14

instance the parties did not agree to arbitrate as all of Plaintiffs' claims relate substantially to the Credit Agreement and not the Project Agreement and Shareholders Agreement as asserted by Defendant. As a result, the Court should exercise its discretion and not stay this action.

## CONCLUSION

Plaintiffs have not breached their contractual obligations to arbitrate this dispute with Defendant. Plaintiffs should not be compelled into arbitration because such enforcement by the Court would preclude Plaintiffs from effectively vindicating its rights.

Dated: New York, New York
      July 6, 2010

Respectfully submitted,

**BRODEGAARD & SIMONE LLC**

By: /s/ Emilie Simone
     Emilie Simone

110 East 59th Street, 23rd Floor
New York, New York 10022
Telephone: (212) 813-0620
Facsimile: (646-355-1920
E-Mail: edv@brodegaardlaw.com

*Attorneys for Plaintiffs*
World GTL Inc. and
World GTL St. Lucia Ltd.

15